**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LIBERTY HANGOUT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 5:18-cv-02567 |
| | ) | |
| v. | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| BEVERLY J. WARREN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR A**
**TEMPORARY RESTRAINING ORDER**

MICHAEL DEWINE (OH Bar No. 0009181)
Attorney General of Ohio

Daniel J. Rudary (OH Bar No. 0090482)
Gary W. Spring (OH Bar No. 0004959)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH 44308
Telephone:    (330) 253-5060
Facsimile:    (330) 253-1977
E-mail:    djrudary@bmdllc.com
           gspring@bmdllc.com

*Special Counsel for Defendants Beverly Warren, Lamar Hylton,*
*Dean Tondiglia, and Richard O'Neill*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... 7

LAW & ARGUMENT ..................................................................................................... 7

CONCLUSION ............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. I ........................................................................................................8

**STATUTES**

42 U.S.C. § 1983..............................................................................................................8

R.C. 3345.21 ....................................................................................................................2

**JUDICIAL OPINIONS**

*Alpha Delta Chi-Delta Chapter v. Reed*,
    648 F.3d 790 (9th Cir.2011) ....................................................................12

*Amidon v. Student Ass'n of State Univ. of New York at Albany*,
    508 F.3d 94 (2d Cir.2007)................................................................15, 19

*Bible Believers v. Wayne County, Mich.*,
    805 F.3d 228 (6th Cir. 2015) ..................................................................17

*Bowman v. White*,
    444 F.3d 967 (8th Cir.2006) .......................................................10, 11, 12

*Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v.
Martinez*,
    561 U.S. 661 (2010)..........................................................................11, 17

*College Republicans of Univ. of Washington v. Cauce*,
    W.D. Wash. No. C18-189, 2018 WL 804497 (Feb. 9, 2018)  .................18

*Cornelius v. NAACP Legal Defense and Ed. Fund, Inc.*,
    473 U.S. 788 (1985)............................................................................8, 13

*Cox v. State of New Hampshire*,
    312 U.S. 569 (1941)..........................................................................13, 14

*Draudt v. Wooster City Sch. Dist.*,
    246 F. Supp.2d 820 (N.D. Ohio 2003).....................................................7

*E.E.O.C. v. City of Cleveland Hts., Ohio*,
   N.D.Ohio No. C 81-2216, 1981 WL 326 (Nov. 5, 1981) ...........................................................7

*Entm't Prods., Inc. v. Shelby County*,
   588 F.3d 372 (6th Cir. 2009) .............................................................................................7, 8

*Faith Ctr. Church Evangelistic Ministries v. Glover*,
   480 F.3d 891 (9th Cir.2007) ...................................................................................................12

*Forsyth Cty., Ga. v. Nationalist Movement*,
   505 U.S. 123 (1992) .............................................................................................2, 16, 17, 18

*Garland, Inc. v. United Seal, Inc.*,
   404 F.2d 256 (6th Cir. 1968) ....................................................................................................7

*Gilles v. Garland*,
   281 Fed.Appx. 501 (6th Cir.2008) .....................................................................................10, 11

*Gilles v. Miller*,
   501 F.Supp.2d 939 (W.D.Ky.2007) ..........................................................................................10

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
   739 F.2d 466 (9th Cir.1984) ....................................................................................................20

*Good News Club v. Milford Central Sch.*,
   533 U.S. 98 (2001) ..................................................................................................................11

*Hamilton's Bogarts, Inc. v. Michigan*,
   501 F.3d 644 (6th Cir. 2007) .................................................................................................6, 7

*Healy v. James*,
   408 U.S. 169 (1972) .................................................................................................................13

*Heffron v. Int'l Soc. for Krishna Consciousness*,
   452 U.S. 640 (1981) .................................................................................................................13

*Hershey v. Goldstein*,
   938 F.Supp.2d 491 (S.D.N.Y.2013) ..........................................................................................12

*Kushner v. Buhta*,
   D. Minn. No. No. 16–cv–2646, 2018 WL 1866033 (Apr. 18, 2018) ........................................13

*Miller v. City of Cincinnati*,
　622 F.3d 524 (6th Cir.2010) ............................................................................................... *passim*

*Morgan v. Bevin*,
　298 F.Supp.3d 1003 (E.D.Ky.2018) ........................................................................................10

*Morrison v. Bd. of Educ. of Boyd Cty.*,
　521 F.3d 602 (6th Cir.2008) ....................................................................................................9

*Northeast Ohio Coalition for the Homeless v. City of Cleveland*,
　105 F.3d 1107 (6th Cir.1997) ................................................................................................13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
　460 U.S. 37 (1983).............................................................................................................10, 14

*Pleasant Grove City, Utah v. Summum*,
　555 U.S. 460 (2009).....................................................................................................10, 11, 12

*Rock for Life-UMBC v. Hrabowski*,
　643 F.Supp.2d 729 (D.Md.2009) ...........................................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
　515 U.S. 819 (1995)...............................................................................................................14

*Seattle Mideast Awareness Campaign v. King Cty.*,
　781 F.3d 489 (9th Cir.2015) ............................................................................................14, 18

*Thaddeus-X v. Blatter*,
　175 F.3d 378 (6th Cir.1999) ..................................................................................................19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　429 U.S. 252 (1977)................................................................................................................19

*Weinberger v. Romero-Barcelo*,
　456 U.S. 305 (1982).................................................................................................................7

*Widmar v. Vincent*,
　454 U.S. 263 (1981)..............................................................................................................8, 13

**OTHER AUTHORITIES**

Goldberg, *Must Universities "Subsidize" Controversial Ideas?: Allocating Security Fees When Student Groups Host Divisive Speakers*, 21 GEO. MASON U. CIV. RTS. L.J. 349 (2011)........17

iv

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Liberty Hangout and Michael Heil are seeking the drastic remedy of a temporary restraining order based on the demonstrably false notion that they have been "singled out" for discriminatory treatment by Kent State University because of their conservative political views. Nothing could be further from the truth, as irrefutably demonstrated in this Memorandum and the declarations filed in support.

Despite submitting a verified Complaint to this Court, Plaintiffs *fail* to acknowledge that Liberty Hangout has not been assessed any security costs in connection with three separate events reserved by the group in the past month. Nor do Plaintiffs inform the Court that Kent State requires *all* student organizations – not just Liberty Hangout – to register major campus events with the University and to submit to the same security review in anticipation of a major event. Applying its written, objective, and publically-accessible security review criteria, Kent State has assessed significantly higher security costs for events sponsored by student organizations advocating more liberal views and for events sponsored by other groups (such as student government and Greek life) that do not advocate any political cause whatsoever.

By feigning victimization by the University administration, Plaintiffs are in actuality seeking *more favorable* treatment than their liberal and non-political counterparts. Whereas Plaintiffs' fellow groups have been required to pay the costs of their major campus events, Plaintiffs demand a free pass to use University property to host non-University affiliated speakers (and to make some extra cash on the side by selling tickets to the public at large) without compensating the University for the reasonable costs incurred to further its legitimate interest of maintaining campus safety and security.

In light of these undisputed facts, Plaintiffs have failed to show a substantial likelihood of success on the merits of their constitutional claims. Plaintiffs do not seriously dispute that their

1

proposed venue – Kent State's Kiva Auditorium – is a limited public forum where government restriction of speech is permissible so long as it is _viewpoint_ neutral and reasonable. This alone renders Plaintiffs' lead case, *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992), inapplicable because *Forsyth* applied strict scrutiny to a traditional public forum.

In a limited public forum, officials may make distinctions on the basis of subject matter and speaker identity, and may also consider an anticipated hostile reaction to speech so long as these concerns are not "speculative" and do not "lack substance." In this case, Kent State assessed security costs for Liberty Hangout's November 19 event according to a thorough list of viewpoint-neutral criteria including the size of the venue, the anticipated number of attendees, Liberty Hangout's own stated security requirements, and the history of recent events involving Liberty Hangout's featured speaker on Kent State's campus.

Because Plaintiffs cannot show that Kent State's assessment of security costs is in any way related to official disapproval of Liberty Hangout's viewpoint or message, their constitutional claims fail and Plaintiffs are not entitled to the drastic and extraordinary remedy of a temporary restraining order.

## STATEMENT OF FACTS

**I.    Kent State University Policies Provide for the Assessment of Security Costs to Registered Student Organizations and University Departments Sponsoring Campus Events**

Pursuant to state law, Kent State University has adopted an "Administrative Policy Regarding Demonstrations, Marches, and Speakers" ("Policy"). *See* R.C. 3345.21 (authorizing University trustees to adopt policies for the maintenance of campus order). The Policy is codified at Section 4-03.1 of the University's Policy Register. *See* Declaration of Lamar Hylton ("Hylton

Dec.") at ¶ 7, Exh. A.[1] Pursuant to the Policy, "[a]ll demonstrations, marches and non-university affiliated speakers […] must be sponsored by a registered student organization or university department."  Policy 4-03.1(C)(1). The sponsoring student organization or university department is "responsible for making the necessary provisions to maintain the peaceful demeanor of the assembly," and "shall be responsible for all expenses and damages incurred to the university." Policy 4-03.1(C)(3).[2]

The University maintains a five-member security review team tasked with determining the level of security necessary at sponsored events and estimating the cost of any security needs. *See* Declaration of Ann Myers ("Myers Dec.") at ¶ 5. The security review team's assessment of security needs and costs is guided by twelve factors that are posted to the University's publicly-accessible website. *Id.* at ¶ 6. Factors considered include the type of event, the projected attendance, the event venue, whether the event is limited to the University community or open to the public, and any prior history of the event. *Id.*

Following the security review team's assessment, estimated costs are presented to the sponsoring organization or University department on a "Confirmation and Facilities and Services" form. Myers Dec. at ¶ 7. The costs charged to sponsoring organizations are based solely on the objective criteria considered by the security review team. *Id.* at ¶¶ 8, 14; Declaration of Dean Tondiglia ("Tondiglia Dec.") at ¶ 8.

Security costs have been assessed for events across the ideological spectrum. In October 2016, for example, the security review team assessed $7,649.46 for security associated with

---

[1] Also available at https://www.kent.edu/policyreg/administrative-policy-regarding-demonstrations-marches-and-speakers.

[2] Additionally, non-sponsored and unregistered "demonstrations, marches, and speakers" may utilize designated areas of the University's campus for expressive purposes, provided no sound amplification equipment is used. Hylton Dec. at ¶¶ 10-11; Policy 4-03.1(D)(1) and (2). Sound amplification may be used in these areas by groups that are sponsored and registered.

then-Democratic presidential nominee Hillary Clinton's speech at Kent State, sponsored by the Kent State College Democrats. Myers Dec. at ¶ 11. The University has also assessed security costs for cultural and social events. In November 2017, for example, the University charged the fraternity Alpha Phi Alpha a total of $2,251.29 in event costs – including $1,296.00 for six police officers and $577.80 for six hall security personnel – for the "Jam Before You Cram" event held in the Kent Student Center. *Id.* at ¶ 12. More recently, the security review team estimated a cost of $1,152.00 for six police officers, $300.00 for two paramedics, and $48.00 per hour for a fire marshal in connection with a student government sponsored concert held in the student center ballroom on September 27, 2018. *Id.* at ¶ 13.

If an event does not present a security need (based on review of the factors considered by the security review team), costs may not be assessed at all. As an example, the University did not assess any security costs to Liberty Hangout in connection with recent pro-Second Amendment and conservative political events held on Kent State's campus on October 24, 2018, October 29, 2018, and November 7, 2018. Myers Dec. at ¶ 9, Exh. A.

## II.    Liberty Hangout Reserves the Kiva Auditorium for an Event Featuring Kaitlin Bennett

On October 10, 2018, Plaintiff Michael Heil submitted an application for Liberty Hangout to use Kent State's Kiva Auditorium on November 19, 2018 for an event titled, "Let's Talk Gun Rights" featuring Kaitlin Bennett ("Bennett"). Plfs.' Compl. (ECF Doc #: 1) at ¶ 13. The Kiva Auditorium is a 410-capacity theater-style space that is closed to members of the public and to the University community when not in use for meetings or special events. Myers Dec. at ¶ 16. To use the Kiva Auditorium, student organizations and outside groups must have an advance reservation. *Id.* The space is not open to members of the University community or to the public for any expressive activity at any time. *Id.*

4

Bennett is a former Kent State student and has no present affiliation with the University. Plf.'s Compl. (ECF Doc #: 1) at ¶ 13. Bennett gained national prominence after being photographed walking across Kent State's campus following her May 2018 graduation ceremony with an AR-10 rifle strapped to her back. Bennett's photograph quickly went "viral" online, and Bennett has since become well-known for her advocacy on firearm-related issues. Bennett has a significant online following. Her Facebook page, "Kait's Unsafe Space," and her Twitter feed (@KaitMarieox) have approximately 138,000 online followers.[3]

Bennet has previously conducted demonstrations on Kent State's campus. On September 29, 2018, Bennett hosted an "Open Carry Rally" in Kent State's Risman Plaza. The rally was not sponsored by a student organization.[4] Tondiglia Dec. at ¶ 8(i). The rally drew hundreds of participants, many of whom were not affiliated with the University. *Id.* Conflict between rally attendees and police led to four arrests, and the University ultimately incurred $65,000.00 in security fees to protect Bennett, rally attendees, and members of the University community. *Id.*

Following her September 29 rally, Bennett received several death threats and other threats of physical violence. Some of these threats have been disclosed by Bennett on her publicly-accessible social media pages. *See* Tondiglia Dec. at ¶ 8(h). The Kent State Police Department has also been informed by the FBI of two credible threats against Bennett, and is aware that Bennett has filed at least two police reports with the Stow Police Department. *Id.*

III.    **Liberty Hangout Sells Tickets for the November 19 Event and Advises Attendees of Various Security Requirements**

Liberty Hangout is presently selling tickets for Bennett's November 19 event to the public at large through the online platform "Eventbrite." Tondiglia Dec. at ¶ 8(d), Exh. A.

---

[3] *See* https://twitter.com/KaitMarieox and https://www.facebook.com/KaitsUnsafeSpace/.

[4] Per Policy 4-03.1(D)(2), non-sponsored and unregistered events like the Rally are permitted in designated open areas provided no sound amplification equipment is used.

Bennett is also advertising ticket sales to her 130,000+ social media followers, at least 962 of whom have "liked" the event. *Id.* at ¶ 8(c). The Eventbrite webpage created by Liberty Hangout to facilitate ticket sales informs prospective attendees that students and non-students must present valid IDs that match the information on their ticket. Tondiglia Dec. at Exh. A. The Eventbrite page also lists several categories of items prohibited at the event and instructs attendees to be prepared for "airport like screening." *Id.* Additionally, Liberty Hangout warns that "disruptive individuals will be refused entry or ejected." *Id.*

IV.   **The University's Security Review Team Applies Objective Criteria to Estimate Security Costs for the November 19 Event and Presents these Costs to Liberty Hangout**

Applying the twelve factors enumerated by the University for the assessment of security costs, the University Police Department and security review team determined that six security personnel and eight University police officers would be necessary to adequately secure the event. *See generally* Tondiglia Dec. at ¶ 8. This determination was based on the size, layout, and number of entrances to the Kiva Auditorium, the number of anticipated attendees, the anticipated presence of members of the general public not affiliated with the University, the need to check attendees for contraband prior to entering the venue (as expressly stated on Liberty Hangout's Eventbrite ticket sales page), and the history of Bennett's prior September 29 rally, as well as subsequent threats made against Bennett. *Id.*

Multiplying the number of officers required to address these concerns by their standard hourly rates, the University determined that it would cost $1,798.40 to provide adequate security for Bennett's November 19 event. Myers Dec. at ¶¶ 19-20, Exh. G; *see also* Tondiglia Dec. at ¶ 6. An estimate of these security costs has been presented to Liberty Hangout as the sponsoring organization. *Id.* Liberty Hangout now seeks emergency injunctive relief in this Court to prohibit the University from assessing any security costs in connection with the November 19 event.

6

<u>STATEMENT OF ISSUES TO BE DECIDED</u>

1.     Whether Plaintiffs have a substantial likelihood of success on the merits of their claims such that they are entitled to the extraordinary remedy of temporary injunctive relief.

2.     Whether Kent State's standard assessment of security costs in connection with Plaintiffs' use of a limited public forum on the University's campus to host a non-University affiliated speaker is reasonable and viewpoint-neutral.

<u>LAW & ARGUMENT</u>

**I.     Temporary Injunctive Relief is an Extraordinary Remedy Sparingly Awarded**

"Injunctive relief is considered an extraordinary remedy and courts use it cautiously and sparingly." *Draudt v. Wooster City Sch. Dist.*, 246 F. Supp.2d 820, 825 (N.D. Ohio 2003) (*citing Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *E.E.O.C. v. City of Cleveland Hts., Ohio*, N.D.Ohio No. C 81-2216, 1981 WL 326, *1 (Nov. 5, 1981) ("A temporary restraining order is an extraordinary and drastic remedy."). "The party seeking the injunction must establish its case by clear and convincing evidence," which is a "high burden." *Draudt*, 246 F. Supp.2d at 832 (*citing Garland, Inc. v. United Seal, Inc.,* 404 F.2d 256, 257 (6th Cir. 1968)).

In evaluating whether a plaintiff overcomes the high burden associated with obtaining a temporary restraining order or preliminary injunction, a "district court considers and balances four factors in making its decision: (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Entm't Prods., Inc. v. Shelby County*, 588 F.3d 372, 377 (6th Cir. 2009) (*quoting Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007)).

"[I]n a First Amendment case, the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits." *Hamilton's Bogarts, Inc.*, 501 F.3d at 649.

7

When a district court determines that a plaintiff has not demonstrated a likelihood of success, balancing the equities (such as the issues of the public interest and harm to the respective parties) is moot in First Amendment cases. *Entm't Prods., Inc.*, 588 F.3d at 395.[5]

## II. Plaintiffs Are Not Entitled to the Extraordinary Remedy of Temporary Injunctive Relief

### A. Plaintiffs cannot demonstrate a likelihood of success on the merits on their First Amendment free speech claim

Count I of Plaintiffs' Complaint seeks relief under the First Amendment to the United States Constitution and 42 U.S.C. § 1983 for alleged violations of Plaintiffs' freedom of speech.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. Amend. I. However, "nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985). This is no less true in the context of higher education. As the Supreme Court recognized over thirty years ago, a public institution of higher learning is entitled to "impose reasonable regulations […] upon the use of its campus and facilities" and is not required "to grant free access to all of its grounds or buildings." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

To determine the constitutionality of a government restriction on speech on publicly-owned property, the court considers: (1) whether the speech is protected; (2) what type of forum is at issue, and; and (3) whether the restriction on speech satisfies the constitutional standard for

---

[5] For this reason, Kent State will confine it analysis in this memorandum to whether Plaintiffs have shown a substantial likelihood of success on the merits of their constitutional claims.

the forum. *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir.2010). Consideration of each factor defeats Plaintiffs' attempt to obtain the drastic remedy of temporary injunctive relief.

1.     ***Plaintiffs have failed to sufficiently allege an injury to their First Amendment rights***

This Court's first task is to determine whether Plaintiffs are engaging in protected expression under the First Amendment. Nowhere in Plaintiffs' complaint, however, is it alleged that the Plaintiffs seek to engage in speech that is somehow being curtailed by the University.[6] Plaintiffs have not, for example, alleged that the University has threatened to cancel or otherwise prohibit the November 19 Event or that the University has taken steps to collect the estimated security fees. The only allegation Plaintiffs have made with respect to the University's security fee policy is that the University has provided them with a "breakdown of estimated costs." Plfs.' Compl. at ¶ 14. The resulting "injury" alleged by Plaintiffs is that "student speech activities" are "being chilled." Plfs.' Compl. at ¶ 19. These threadbare allegations of subjective chilling are plainly insufficient to state a plausible First Amendment claim and confer standing.  *See Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 608 (6th Cir.2008) (subjective chill is insufficient to establish First Amendment standing).

2.     ***Kent State University's Kiva Auditorium is a limited public forum***

Assuming *arguendo* that Plaintiffs have sufficiently alleged an injury to their protected speech rights under the First Amendment, this Court must determine the level of constitutional protection afforded. This is a function of the "forum analysis." The Supreme Court and the Sixth Circuit have recognized four distinct types of fora: (1) the traditional public forum, (2) the designated public forum, (3) the limited public forum, and (4) the non-public forum. *Miller*, 622

---

[6] To be clear, the anticipated "speaker" is Kaitlin Bennett – a non-student and a non-party to this case.

9

F.3d at 533-36; *Morgan v. Bevin*, 298 F.Supp.3d 1003, 1010 (E.D.Ky.2018) (citing *Miller* as recognizing "four types of fora").

"Traditional public fora include sidewalks, parks, and other areas that by tradition or by government fiat are open to public assembly and debate." *Miller*, 622 F.3d at 534. Restrictions on speech in a traditional public forum must survive strict scrutiny. *Id*. Thus, "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

"The government creates a designated public forum when it opens a piece of public property to the public at large, treating as if it were a traditional public forum." *Miller*, 622 F.3d at 534. Designated public fora include the open areas of a state university. *See Gilles v. Garland*, 281 Fed.Appx. 501, 509 (6th Cir.2008) ("streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently [than a traditional public forum] when they fall within the boundaries of the University's vast campus.") (*quoting Bowman v. White*, 444 F.3d 967, 978 (8th Cir.2006)); *see also Gilles v. Miller*, 501 F.Supp.2d 939, 948 (W.D.Ky.2007) ("the Court will consider the open areas of MSU's campus to be designated public fora."). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Miller*, 622 F.3d at 534 (*quoting Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469–70 (2009)).

A "limited public forum" is created when the government opens its property "to use by certain groups or dedicated solely to the discussion of certain subjects." *Miller*, 622 F.3d at 534-

35 (*quoting Summum*, 555 U.S. at 470). Examples of a "limited public forum" include public school facilities opened to the public for meetings and events, subject to the permission of the school administration. *See Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001) (public school facilities open to public groups for after-hours meetings); *Miller*, 622 U.S. at 535 (city hall space that could be reserved for use by outside groups with sponsorship and permission was a limited public forum). The Supreme Court "has permitted restrictions on access to a limited public forum, [...], with this key caveat: Any access barrier must be reasonable and viewpoint neutral." *Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 679 (2010); *see also Miller*, 622 F.3d at 535 (applying viewpoint neutrality test to a limited public forum).

Finally, "a nonpublic forum is a publicly-owned property that is not by tradition or governmental designation a forum for public communication." *Miller*, 622 F.3d at 535. The same standard applicable to a limited public forum (i.e., viewpoint neutrality and reasonableness) applies in a nonpublic forum. *Id.*

The record before the Court conclusively establishes that Kent State's Kiva Auditorium is a limited public forum. First, Kiva is not analogous to a public park or sidewalk such that it would constitute a "traditional" public forum. Not even the *open* areas of a state university campus are accorded this designation. *See Gilles v. Garland*, 281 Fed.Appx. 501, 511 (6th Cir.2008) ("the great weight of authority, [...] has rejected the notion that open areas on a public university campus are traditional public fora."); *Bowman v. White*, 444 F.3d 967, 978 (8th Cir.2006) ("In the case of the University, although it possesses many of the characteristics of a public forum, such as open sidewalks, it differs in significant respects from public forums such as streets or parks or even municipal theaters * * * Thus, streets, sidewalks, and other open areas

11

that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus.").

Consistent with *Giles* and *Bowman*, open areas of a state university campus are (at most) designated public fora. This distinction makes sense in the context of Kent State's campus. For example, University Policy 4-03.1(D)(2)(a) specifically "designates" certain open areas of the University's campus for "demonstrations, marches, and non-university affiliated speakers." These areas include the Kent Student Center plaza (also known as Risman Plaza), the University commons, the south side of the memorial athletic and convocation center, and Manchester Field. *Id.*; *compare with Bowman*, 444 F.3d at 978-79 (university's designation in policy handbook of certain open areas as available to the public for expressive activity rendered those areas "designated" public fora).

It strains credulity to place the Kiva Auditorium within the same "designated public forum" category as these open areas of Kent State's campus. The Kiva Auditorium is a special event space that is available to student organizations and outside groups by reservation only. Myers Dec. at ¶ 16. When not in use for a scheduled event, the Kiva Auditorium remains locked and cannot be accessed by University students or the public at large. *Id.* In this way, the University has opened the Kiva Auditorium "to use by certain groups" or for "the discussion of certain subjects." *Miller*, 622 F.3d at 534-35 (*quoting Summum*, 555 U.S. at 470); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 798 (9th Cir.2011) ("Requiring prior permission for access to a forum demonstrates that a public forum has not been created by designation.") (*quoting Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 909 (9th Cir.2007)). District courts assessing similar spaces in other public universities have reached the same conclusion. *See Hershey v. Goldstein*, 938 F.Supp.2d 491, 507 (S.D.N.Y.2013) ("Common examples of limited public fora include state university meeting facilities opened for student

12

groups […].”); *Kushner v. Buhta*, D. Minn. No. No. 16–cv–2646, 2018 WL 1866033, *10 (Apr. 18, 2018) (law school lecture hall with capacity to seat 150 people was a limited public forum).

### 3.    *Kent State's security fee policy is viewpoint-neutral and reasonable*

Because Plaintiffs' challenge arises in the context of a limited public forum, the Court must determine whether the University's decision to charge security costs to Liberty Hangout is "reasonable" and "viewpoint neutral." *Miller*, 622 F.3d at 535.

<u>*Kent State's security policy is reasonable*</u>. The government's restrictions on speech in a limited public forum must be reasonable "in light of the purposes of the forum and all surrounding circumstances." *Cornelius*, 473 U.S. at 809. Such restrictions "need not be the most reasonable or the only reasonable limitation." *Id.* at 808. Indeed, the University's "mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar*, 454 U.S. at 267 n.5.

Relevant here, the Supreme Court and the Sixth Circuit have long held that a regulation requiring a person "pay a license or permit fee before he can engage in a constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses incurred in furtherance of a legitimate state interest." *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109–10 (6th Cir.1997); *Cox v. State of New Hampshire*, 312 U.S. 569, 577 (1941).

It cannot be disputed that "[s]afety and security are legitimate interests of a university." *Rock for Life-UMBC v. Hrabowski*, 643 F.Supp.2d 729, 747 (D.Md.2009), *aff'd,* 411 Fed.Appx. 541 (4th Cir.2010); *see also Healy v. James*, 408 U.S. 169, 184 (1972) ("[A] college has a legitimate interest in preventing disruption on the campus."); *Heffron v. Int'l Soc. for Krishna*

13

*Consciousness*, 452 U.S. 640, 650–51 (1981) ("[A] State's interest in protect[ing] the safety and convenience of persons using a public forum is a valid governmental objective.").

To advance the legitimate interest of defraying expenses incurred to ensure the safety and security of participants in campus events, Kent State charges security fees to student organizations sponsoring campus events when the University's security review team determines that a sponsored event presents a security need. This determination is based upon and guided by twelve objective criteria that are publicly available for review on the University's website. *Myers Dec.* at ¶ 6. That some organizations are charged more than others (or not charged at all) is a strict function of the varying conditions attendant to each event (including venue, number of attendees, the presence of an outside speaker, etc.) – something that the Supreme Court has long recognized as constitutionally permissible. *See Cox*, 312 U.S. at 577 ("we perceive no constitutional ground for denying to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought.").

Because the University's assessment of security costs is "based on a standard that is definite and objective," *Seattle Mideast Awareness Campaign*, 781 F.3d at 549, it more than satisfies the reasonableness requirement attendant to a limited public forum.

<u>*Kent State's security policy is viewpoint neutral*</u>. "Viewpoint" neutrality is significantly less restrictive of government regulation than "content" neutrality. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995); *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir.2015) ("In limited public forums, **content-based restrictions are permissible**, as long as they are reasonable and viewpoint neutral.") (emphasis added). Consistent with viewpoint neutrality, the government may "make distinctions in access on the basis of subject matter and speaker identity." *Perry Educ. Ass'n*, 460 U.S. at 49.

14

Viewpoint-neutral restrictions can also "have a disparate impact on different viewpoints so long as the university's purpose is not to discriminate based on viewpoint." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 105 (2d Cir.2007).

In this case, there can be no dispute that the University's assessment of security costs does not take into consideration the viewpoint of the student organization or the speaker. Indeed, the University has *not* assessed security costs against Liberty Hangout for several recent events that did not pose any special security needs. These include an October 29, 2018 event where Liberty Hangout erected an informational table surrounded by mock "tombstones" in Kent State's Risman Plaza to protest the "death" of gun rights.  Myers Dec. at ¶ 10.

Conversely, the University has assessed significant security fees against groups that might be perceived to be on the opposite side of the political spectrum. When Democratic presidential nominee Hillary Clinton visited Kent State's campus in October 2016 at the behest of the College Democrats, the University assessed $7,649.46 security costs. Myers Dec. at ¶ 11.

The security fee policy has also been applied to non-political groups, including fraternities and sororities. Specifically, Kent State fraternity Alpha Phi Alpha was billed $1,296.00 for police and $577.80 for security personnel in connection with the social event, "Jam Before You Cram" held in the Kent Student Center on November 30, 2017. Myers Dec. at ¶ 12. Kent State Undergraduate Student Government was likewise charged $3,694.05 – including $1,152.00 for six police officers, $300.00 for two paramedics, and $48.00 per hour for a fire marshal – in connection with a concert held in the Kent Student Center Ballroom on September 27, 2018. *Id.* at ¶ 13.

There is simply no evidence in the record before this Court that would support Plaintiffs' conclusory allegation that Kent State has assessed security fees against Liberty Hangout in an intentional effort to "discriminate based on viewpoint." *Amidon*, 508 F.3d at 105. Perhaps

recognizing this, Plaintiffs attempt to rely on inapplicable precedent applying *strict scrutiny* to First Amendment claims arising in *traditional public fora* to create the appearance of a First Amendment violation. The attempt fails.

The prime example of Plaintiffs' failure to recognize the appropriate forum (and to apply the appropriate constitutional standard) is their near-exclusive reliance on *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992). In *Forsyth*, the Supreme Court struck down a county ordinance that gave a lone administrator the authority to assess a permit fee against organizations seeking to conduct demonstrations on public property. "The decision how much to charge for police protection or administrative time—or even whether to charge at all—[was] left to the whim of the administrator" without any "narrowly drawn, reasonable and definite standards" to guide his assessment. 505 U.S. at 133. Without such standards, "the administrator must necessarily examine the content of the message that is conveyed" to "estimate the response of others to that content, and judge the number of police necessary to meet that response." *Id.* at 134. Because this content-based assessment was antithetical to the traditional public forum at issue in *Forsyth*, the Supreme Court applied strict scrutiny to invalidate the ordinance on First Amendment grounds.

Plaintiffs' attempt to analogize this case to *Forsyth* fails *ab initio*. As the *Forsyth* Court recognized, the plaintiffs' challenge arose in the "archetype of a traditional public forum." 505 U.S. at 130. Here, by contrast, the Kiva Auditorium is a *limited public forum*. *See* Section II.A.2, *supra*. Plaintiffs do not seriously dispute this.[7]

---

[7] In their Complaint, Plaintiffs allege (in a contradictory manner) that the Kiva Auditorium is "at minimum a limited public forum, or at least a designated public forum – as it must be." Plfs.' Compl. (ECF Doc #: 1) at ¶ 21. In that same paragraph, Plaintiffs articulate the standard applicable under strict scrutiny, which has no place in a limited public forum analysis. *See Miller*, 622 F.3d at 539 ("The appropriate First Amendment standard in this case is viewpoint neutrality and rational relationship to the purpose of the forum, not strict scrutiny."). Plaintiffs'

16

Given the disparity between the levels of permissible government regulation in a traditional and a limited public forum, courts and scholars have expressed significant doubt over *Forsyth's* application to cases involving student organizations at public universities. *See* Goldberg, *Must Universities "Subsidize" Controversial Ideas?: Allocating Security Fees When Student Groups Host Divisive Speakers*, 21 GEO. MASON U. CIV. RTS. L.J. 349, 389 (2011) ("*Forsyth's* ban on imposing extra security fees for controversial speech as a content-based restriction on speech *is technically not relevant to limited public forums* like the student organizational context, *where content-based restrictions are permissible*.") (emphasis added); *see also Martinez*, 561 U.S. at 661 ("the strict scrutiny the Court has applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums—the State's authority to reserve them for certain groups.").

In other words, the strict scrutiny analysis employed in *Forsyth* is simply inapplicable to cases involving a limited public form. *See also Miller*, 622 F.3d at 539 (viewpoint neutrality and reasonableness – not strict scrutiny – apply in limited forum cases). This provides an immediate basis for distinguishing *Forsyth* and the other authorities relied upon by Plaintiffs in their quest to secure the extraordinary remedy of a temporary restraining order.[8]

---

Motion for Temporary Restraining Order likewise concedes that "the Kiva event space constitutes, at a minimum, a limited public forum for the purposes of any analysis under the First Amendment" but go on to cite *Forsyth* – a traditional public forum case – as controlling authority. Plfs.' Mtn. for TRO (ECF Doc #: 5) at pp. 5-6. It would therefore appear that Plaintiffs – at best – are using inconsistent labels and standards when discussing the applicable constitutional forum and standard of review in this case.

[8] In addition to *Forsyth*, Plaintiffs' Motion cites to several cases that either apply *Forsyth* to traditional public fora (inapplicable here) or fail to recognize that *Forsyth* is inapplicable to cases involving limited or non-public fora. *See Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 252 (6th Cir. 2015) (applying *Forsyth* to a traditional public forum subject to content-neutrality); *College Republicans of Univ. of Washington v. Cauce*, W.D. Wash. No. C18-189, 2018 WL

17

Recognizing the distinction between permissible government regulation in traditional and limited public fora, the Ninth Circuit has explained why the "heckler's veto" concerns animating *Forsyth* and advanced by Plaintiffs "do not carry the same weight" in the context of a limited public forum like the Kiva Auditorium:

> The "heckler's veto" concerns […] would be troubling in a traditional or designated public forum, but they do not carry the same weight in a limited public forum. Excluding speech based on an anticipated disorderly or violent reaction of the audience is a form of content discrimination, generally forbidden in a traditional or designated public forum. ***In a limited public forum, however, what's forbidden is viewpoint discrimination, not content discrimination.*** That does not mean "heckler's veto" concerns have no relevance in a limited public forum: A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view. That might be the case, for example, where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed.

*Seattle Mideast Awareness Campaign*, 781 F.3d at 502–03 (emphasis added).

While Kent State did consider the history of Bennett's prior demonstration on campus (i.e., her September 29, 2018 Open Carry Rally) and threats of physical violence against Bennett (among other objective criteria) when assessing the appropriate level of security, these concerns are not "speculative" and certainly do not "lack substance." Verifiable facts supporting Kent State's assessment that Bennett's presence on campus will require security include:

- Bennett's September 29, 2018 Open Carry Rally brought hundreds of non-University affiliated individuals to campus, led to four arrests, and resulted in the University incurring $65,000.00 in security costs. *See* Tondiglia Dec. at ¶ 8(i).

- Bennett and Liberty Hangout have posted reports of death threats and other threats of physical violence directed toward Bennett in recent weeks on their respective social media pages. *See id.* at ¶ 8(h).

---

804497 (Feb. 9, 2018) (applying *Forsyth* to a limited public forum but failing to acknowledge that *Forsyth* is a traditional public forum case).

18

- Kent State's Police Department has been informed by the FBI of two credible reports of threats being made against Bennett and is also aware that Bennett has recently filed two police repots with the Stow, Ohio police department. *Id.*

- In its advertising for the November 19 Event, Liberty Hangout has instructed participants to be prepared for "airport-like screening" and has warned that disruptive participants will be "ejected." *See id.* at ¶ 8(d), Exh. A.

These facts give substance to Kent State's security concerns and provide an additional viewpoint-neutral basis for assessing the appropriate level of security for the November 19 event. *See Seattle Midwest*, 781 F.3d at 502-03 (recognizing that anticipated hostile reaction to speech is a form of *content*, not *viewpoint* discrimination). The fact that these objective criteria "have a disparate impact on different viewpoints" is permissible "so long as the university's purpose is not to discriminate based on viewpoint." *Amidon*, 508 F.3d at 105. Apart from unsupported speculation, Plaintiffs have not offered any evidence suggesting that Kent State has assessed security fees against Liberty Hangout based on official disapproval of Liberty Hangout's message. For this reason, Plaintiffs are not likely to succeed on their First Amendment claim.

**B.     Plaintiffs are unlikely to succeed on the merits of their remaining constitutional claims**

Plaintiffs' remaining First Amendment claims are based on the same underlying facts as their free speech claim. Because the Sixth Circuit evaluates companion First Amendment claims using the same analysis applicable to free speech claims, *see Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir.1999), the remaining First Amendment claims fail for the reasons given above.

With respect to their Fourteenth Amendment due process and equal protection claims, Plaintiffs fail to identify the deprivation of any interest in life or liberty (for the reasons given above) or property (because they have not identified any protected property interest). Nor can they prove "discriminatory intent or purpose" that would give rise to a valid equal protection claim. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

### C.      Plaintiffs Cannot Make a Showing of Irreparable Harm

Plaintiffs assert that even a threatened loss of First Amendment freedom constitutes irreparable harm. They fail to acknowledge that it is only the "purposeful unconstitutional suppression of speech" that "constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir.1984). As explained in detail above, Plaintiffs have presented no evidence to this Court that would support a finding of purposeful suppression based on Liberty Hangout's political viewpoint. Plaintiffs' claim of irreparable harm therefore rings hollow and they are not entitled to the extraordinary and drastic remedy of a temporary restraining order.

### <u>CONCLUSION</u>

Pursuant to the argument and authorities cited here, Defendants respectfully move this honorable Court for an order DENYING Plaintiffs' Motion for Temporary Restraining Order.

Dated: November 9, 2018                    Respectfully submitted,

MICHAEL DEWINE (OH Bar No. 0009181)
Attorney General of Ohio

/s/ *Daniel J. Rudary*
Daniel J. Rudary (OH Bar No. 0090482)
Gary W. Spring (OH Bar No. 0004959)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH  44308
Telephone:      (330) 253-5060
Facsimile:      (330) 253-1977
E-mail:          djrudary@bmdllc.com
                    gspring@bmdllc.com

*Special Counsel for Defendants Beverly Warren, Lamar Hylton, Dean Tondiglia, and Richard O'Neill*

20

**<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that on the 9th day of November, 2018 a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Daniel J. Rudary*
*Counsel for Defendants*

4829-9700-4410, v. 2